**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2013-CT-00408-SCT**


*PERRIECE COLLINS, INDIVIDUALLY AND AS
THE PARENT, LEGAL GUARDIAN AND NEXT
FRIEND OF SHONIQWA COLLINS,
INDIVIDUALLY AND AS THE PARENT, LEGAL
GUARDIAN AND ON BEHALF OF ANY AND ALL
WRONGFUL DEATH BENEFICIARIES OF
SHATAJA NIKEARA COLLINS, DECEASED*

*v.*

*TOIKUS WESTBROOK, M.D.*


**ON WRIT OF CERTIORARI**


| | |
|---|---|
| DATE OF JUDGMENT: | 02/06/2013 |
| TRIAL JUDGE: | HON. VERNON R. COTTEN |
| TRIAL COURT ATTORNEYS: | SHANE F. LANGSTON |
| | REBECCA M. LANGSTON |
| | JESSICA ELIZABETH MURRAY |
| | MARY FRANCES STALLINGS-ENGLAND |
| | L. CARL HAGWOOD |
| | JOHN MICHAEL COLEMAN |
| COURT FROM WHICH APPEALED: | LEAKE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | SHANE F. LANGSTON |
| | REBECCA M. LANGSTON |
| ATTORNEYS FOR APPELLEE: | JOHN MICHAEL COLEMAN |
| | L. CARL HAGWOOD |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND REMANDED - 02/11/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     Perreice Collins filed a wrongful death action on behalf of her minor daughter, Shoniqwa, and on behalf of the wrongful death beneficiaries of Shoniqwa's stillborn daughter, Shataja. Finding that Collins had not shown good cause for her failure to effect service of process upon Dr. Toikus Westbrook, the Circuit Court of Leake County granted Dr. Westbrook's motion to dismiss. Collins appealed, and this Court assigned her case to the Court of Appeals, which affirmed the decision of the trial court. Collins then filed a Petition for Writ of Certiorari, which this Court granted.

¶2.     We hold that Collins offered uncontradicted proof of "good cause" in explanation of her failure to serve process upon Dr. Toikus Westbrook within 120 days of having filed a civil complaint as required by Rule 4(h) of the Mississippi Rules of Civil Procedure. Collins also established "excusable neglect," as contemplated by Rule 6(b) of the Mississippi Rules of Civil Procedure, entitling her to an extension of time in which to serve process upon Dr. Toikus Westbrook. Therefore, we reverse the judgments of the trial court and the Court of Appeals and remand this case to the Circuit Court of Leake County for further proceedings.

**FACTS**

¶3.     On December 16, 2011, Collins filed a complaint in the Circuit Court of Leake County on behalf of her minor daughter, Shoniqwa Collins, and the other wrongful death beneficiaries of Shataja Nikeara Collins, a stillborn infant. The complaint named Dr. Toikus Westbrook, a physician, and others as defendants and alleged that Dr. Toikus Westbrook's

2

negligence, including his failure to intervene under circumstances which clearly indicated fetal distress, wrongfully caused the death of the infant. Thus, under the provisions of Rule 4(h), Collins had 120 days, or until April 14, 2012, to serve the complaint and summons on all of the named defendants, including Dr. Toikus Westbrook. M.R.C.P. 4(h).

¶4. Shane Langston, Collins's lead attorney, delegated the responsibility of having process served on Dr. Toikus Westbrook to his longtime legal assistant. However, during the 120-day period allowed for service upon this defendant, the legal assistant experienced "very extreme personal problems." A few days before the deadline, Langston realized that the legal assistant had failed to effect service of process on the defendants.

¶5. On April 11, 2012, Langston hired Quantum Process, a professional process-serving company in Hattiesburg, Mississippi, to serve Dr. Toikus Westbrook. Robert David "Davy" Keith II, Quantum Process's owner, using a technique called a "skip trace," attempted to find an address for Toikus Westbrook. The skip trace results listed two possible addresses for that person: one in New Orleans, Louisiana, and the other in Germantown, Tennessee.[1]

¶6. On April 13, 2012, Keith telephoned the residential telephone number at a location that matched the address associated with Dr. Toikus Westbrook in Germantown, Tennessee. According to Keith, he left a message on the answering machine for Dr. Toikus Westbrook. Someone, using the Germantown, Tennessee, residential telephone number, returned Keith's call. Keith explained to the caller that he had a delivery for Dr. Toikus Westbrook. At first,

---

[1] The dissent observes that, on April 13, 2012, Keith told Collins's counsel in an email that "I think the chances of serving [Dr. Toikus Westbrook] today are very slim." But eighteen minutes later, Keith sent another email assuring Collins's counsel that he would be able to effect service of process on Dr. Toikus Westbrook that day.

the caller told Keith, "he's not available." Keith told the caller that he had a delivery from "Maxim Physicians," Dr. Toikus Westbrook's employer. The person on the telephone then said: "Oh, that's me. You can bring that to me," claiming that he was on his way to Incredible Pizza, a pizzeria in Germantown. He asked whether Keith could meet him there. Keith arranged for Gary Murphree, a process server in Memphis, Tennessee, to meet Dr. Toikus Westbrook at Incredible Pizza in nearby Germantown.

¶7.     According to Murphree, he arrived at Incredible Pizza and asked restaurant personnel to page Toikus Westbrook. An employee then escorted Murphree to a back room where a man was sitting. When Murphree asked the man whether he was Toikus Westbrook, the man said "yes," and Murphree, who had hidden the summons and complaint in a pizza box, opened the box, removed the papers, and handed the man the papers. Murphree informed the man: "You have now been served." Murphree executed an Affidavit of Service, in which he stated that he had served the summons and the complaint on Toikus Westbrook on April 13, 2012.

¶8.     On May 7, 2012, Dr. Toikus Westbrook filed a motion to dismiss, arguing that his father, Dr. Jesse Westbrook, actually had been served and that the complaint should be dismissed because of insufficient service of process. On May 21, 2012, Dr. Toikus Westbrook filed the affidavit of Dr. Jesse Westbrook in support of the motion to dismiss, which had been signed on May 7, 2012. In this affidavit, Dr. Jesse Westbrook averred:

> That he is an adult resident citizen of Germantown, Tennessee, over the age of eighteen years and legally competent to give this affidavit.
>
> That he is a dentist practicing in Memphis, Tennessee.

4

That his home address is 1666 Newsum Drive, Germantown, Tennessee 38138.

That he was served with process in the above-referenced case on or about April 14, 2012.

That he has no personal knowledge of this case other than his son is named Toikus Westbrook, M.D.

That he was not practicing medicine on or about June 30, 2010, at Leake County Memorial Hospital.

¶9. On June 14, 2012, Dr. Jesse Westbrook executed a second affidavit, in which he stated:

That he is an adult resident citizen of Germantown, Tennessee, over the age of eighteen years and legally competent to give this affidavit.

That on or about April 16, 2012, he received a telephone call at his home from a man stating that he had some important documents regarding physician services for a "Dr. Westbrook."

Dr. Jesse Westbrook then identified himself as "Dr. Westbrook."

The man requested to meet Dr. Jesse Westbrook at his home; however, Dr. Westbrook informed the man that he and his family were headed to dinner at Incredible Pizza in Germantown, Tennessee.

While at Incredible Pizza, a man approached Dr. Westbrook with a pizza box and pulled out some documents.

The man handed the documents to Dr. Jesse Westbrook and said, "You have now been served."

The man immediately turned around and left Incredible Pizza.

Dr. Jesse Westbrook did not know the content of these papers until he read them as the process server was leaving.

In neither the telephone call nor the personal meeting did anyone confirm that Dr. Jesse Westbrook was anyone other than "Dr. Westbrook."

¶10. The trial court held the first hearing on Toikus Westbrook's motion to dismiss in June 2012. The hearing was not transcribed, but the uncontested affidavit of Jessica Murray, an attorney representing Collins at the hearing, stated that neither Dr. Jesse Westbrook nor Dr. Toikus Westbrook attended the hearing and no additional evidence was offered. The trial judge continued the hearing, informing counsel that he would like to consider witness testimony before making a decision about whether process had been served on Dr. Toikus Westbrook.

¶11. The second hearing on the motion to dismiss was held on October 31, 2012. Keith, the owner of Quantum Process, provided the following testimony:

> LANGSTON: Mr. Keith, tell Your Honor what efforts you were asked to make on behalf of my law firm to serve process on Dr. Toikus Westbrook, in or around April of this year?
>
> KEITH: Around April of this year, I was contacted by your law firm, Langston and Langston, to locate and serve process on a Toikus Westbrook. If I [re]call there were several—
>
> THE COURT: Let's refer to them as junior and senior, so we'll be sure—or can we not?
>
> LANGSTON: Your Honor, it's not junior and senior.
>
> THE COURT: All right. What is it?
>
> LANGSTON: The father is Jesse Westbrook and this gentleman is Toikus Westbrook. So there aren't two Toikuses, I'm sorry.
>
> THE COURT: Dr. Jesse Westbrook is the father's name; is that right?
>
> LANGSTON: Yes, sir. He's a dentist, so I understand.
>
> THE COURT: All right.

KEITH: I was given, I believe, it was two addresses initially. One was in Picayune and one was in Carthage, if I'm not mistaken. We attempted to serve process on Dr. Toikus Westbrook at both of those locations. He was at neither address. I did further research in order to obtain a current address for Dr. Westbrook.

LANGSTON: What kind of research did you do?

KEITH: It's commonly referred to as a locator or a skip trace, and it's basically research, computer research that shows reported addresses of people that reside at a given address. It's based on—we call credit header information. And when I did a search by the name of Toikus Westbrook, using his past known addresses as a template or as a method to link a newer address, I discovered an address for him in Germantown, Tennessee. I obtained a phone number to the address in Germantown, Tennessee, and called. I believe I called and left a message for Dr. Toikus Westbrook. Someone called me back and ultimately identified himself as Dr. Toikus Westbrook. I advised him that I had a delivery for him. He said, you can—I'm going to be leaving my home address. You can have someone meet me at a pizza parlor—

LANGSTON: All right. Let me back up just a moment. In that conversation you had, this was a return call you got; is that correct?

KEITH: Yes, sir.

LANGSTON: And the return caller, when you answered the telephone, how did he identify himself?

KEITH: The conversation was had, and I told him that I had a delivery for Dr. Toikus Westbrook.

LANGSTON: What did he say originally?

KEITH: He—when I told him that, he said, he's not available.

LANGSTON: Okay.

KEITH: And I said, well, I've got to give this to him. He's got to sign for it. And he said, well, what is it about. And I told him it was something to do with a physician. I had found information that Dr. Westbrook was affiliated with the Maxim Physicians. Now, in my experience, I basically told him that I had a delivery regarding Maxim Physicians.

7

LANGSTON: Okay. And so what did he say after that?

KEITH: He said, oh, that's me. You can bring that to me. And I said, okay. He said, I—that's me, as in I am Dr. Toikus Westbrook.

LANGSTON: Right.

KEITH: And I said, okay, I can have someone over at your house within a—within the hour. And he stated, well, I'm leaving, going to some pizza place. He gave me the address he also gave me his cell phone number. [sic] It was at that time that I contacted my Memphis, Tennessee process server, which is Mr. Gary Murphree, and advised him that we—I had a paper that needed to be served on a Dr. Toikus Westbrook, and he'd given the information that he would meet him at the said pizza place.

LANGSTON: All right. So you asked him to then—

KEITH: I asked him then to go to the pizza place and identify Dr. Toikus Westbrook and serve him the papers.

LANGSTON: And do your notes identified [sic] on what day that service at that pizza restaurant, was accomplished?

KEITH: It was—I believe that's going to be April . . . .

¶12.    Gary Murphree testified about serving Dr. Toikus Westbrook at Incredible Pizza:

LANGSTON: And Mr. Murphree, do you recall in or around April of 2012, you were asked to deliver process to Dr. Toikus Westbrook?

MURPHREE: Yes, I do.

LANGSTON: And tell Your Honor what you were asked to do, who asked you?

MURPHREE: David Keith's company called me and asked me to serve a paper, told me where the person would be, what time the person would be there. I got the papers in hand, went down to the place of—

LANGSTON: Where did you go?

8

MURPHREE: It was a pizza place.

LANGSTON: Incredible Pizza?

MURPHREE: Incredible Pizza was the name of it. It was in—off of Germantown Road there in Memphis, Tennessee.

LANGSTON: And tell your honor what you did after you got there.

MURPHREE: When I got there, I had one of the employees to page . . . Toikus Westbrook. A black female lady came out and she took me back to the—there was a little room back there and there was a gentleman sitting there. I asked him if he was Toikus Westbrook; he said yes. I had the papers in a box. I opened the box, I handed him the papers, and I left.

¶13.    In addition to testifying at the hearing, both Keith and Murphree submitted affidavits with substantially the same information each had provided in his testimony. Moreover, Collins introduced evidence related to the "skip trace" Keith had performed to identify the address and telephone number of Dr. Toikus Westbook. The skip trace indicated that the Newsum Drive address in Germantown, Tennessee, was a recent address associated with Dr. Toikus Westbrook.

¶14.    Neither Dr. Jesse Westbrook nor Dr. Toikus Westbrook appeared at the motion hearing or testified. Instead, Dr. Toikus Westbrook relied on the information contained in Dr. Jesse Westbrook's affidavits dated May 7, 2012, and June 14, 2012. He also submitted his own affidavit in support of his motion to dismiss, which was dated November 15, 2012, more than two weeks after the motion hearing was conducted. In his affidavit, Dr. Toikus Westbrook averred:

That he is an adult resident citizen of New Orleans, Louisiana, over the age of eighteen years and legally competent to give this affidavit.

9

That his current residence address has been 1542 Debattista Place, New Orleans, Louisiana 70131 since 2005.

That his residence telephone number in New Orleans, Louisiana, has been 504-365-2153 since 2005.

That his father is Jesse Westbrook D.D.S.

That his father, Jesse Westbrook's, residence address is 1666 Newsum Drive, Germantown, Tennessee 38138.

That his father, Jesse Westbrook's, residence telephone number is 901-754-4472.

That he has never been served with process in this case.

¶15.    On February 8, 2013, the trial court entered a judgment of dismissal in favor of Dr. Toikus Westbrook. The court found Dr. Toikus Westbrook had not been served within the 120-day period and that Collins had not shown "good cause" or "excusable neglect" to justify an enlargement of time in which to serve him.

## DISCUSSION

¶16.    A trial court's finding of fact on the existence of good cause for the delay in service of process has been deemed "a discretionary ruling . . . and entitled to deferential review." *Rains v. Gardner*, 731 So. 2d 1192, 1197-98 (Miss. 1999). When reviewing fact-based findings, this Court examines "whether the trial court abused its discretion and whether there was substantial evidence supporting the determination." *Id.* at 1197.

¶17.    Mississippi Rule of Civil Procedure 4(h) states:

> If a service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant

10

without prejudice upon the court's own initiative with notice to such party or upon motion.

M.R.C.P. 4(h).

¶18. If a process server has executed a return properly, there is a presumption that service of process has occurred. *Pointer v. Huffman*, 509 So. 2d 870, 872 (Miss. 1987). The plaintiff's attorney in this case, because Murphree had executed an Affidavit of Service, had good reason to believe that service of process had been accomplished upon Dr. Toikus Westbrook. However, this presumption that service has been effected is rebuttable through the use of extrinsic evidence, including the testimony of the party who is contesting service. *McCain v. Dauzat*, 791 So. 2d 839, 842 (Miss. 2001). Here, Murphree executed an Affidavit of Service in which he swore that he had served the summons and the complaint on Dr. Toikus Westbrook on April 13, 2013. Thus, Collins was entitled to a presumption that service of process was effected. But, Dr. Toikus Westbrook then swore, via affidavit submitted to the trial court, that he did not receive service of process. Moreover, Dr. Jesse Westbrook swore, also via affidavit, that the process server served both the summons and complaint on him at Incredible Pizza in Germantown, Tennessee. Therefore, the trial court did not abuse its discretion in determining that process was not served on Dr. Toikus Westbrook, but that process instead was served on Dr. Jesse Westbrook, and that Dr. Toikus Westbrook had thus rebutted the presumption that service of process was effected properly by Murphree.

¶19. We turn to the trial court's ruling that Collins failed to show good cause why service was not made within 120 days. The Rules of Civil Procedure provide that if a plaintiff can establish "good cause" for failing to serve process on a defendant within 120 days of filing

11

his or her complaint, dismissal is not an appropriate remedy. M.R.C.P. 4(h); *see **Webster v. Webster***, 834 So. 2d 26, 28 (Miss. 2002) (citing ***Watters v. Stripling***, 675 So. 2d 1242, 1244 (Miss. 1996)) ("The rule has also been interpreted to require that, if the defendant is not served within 120 days, the plaintiff must either refile the complaint before the statute of limitations expires or show good cause; otherwise, dismissal is proper."). "To establish 'good cause' the plaintiff must demonstrate at least as much as would be required to show excusable neglect, 'as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice.'" ***Webster***, 834 So. 2d at 28 (citations omitted). Moreover, to demonstrate "good cause," the plaintiff must show that a diligent effort was made to serve the defendant in a timely manner. ***Foss v. Williams***, 993 So. 2d 378, 379 (Miss. 2008). The plaintiff must show more than that service failed due to "simple inadvertence or mistake of counsel or ignorance of the rules." ***Watters***, 675 So. 2d at 1243.

¶20. This Court has held that "good cause is likely (but not always) to be found when the plaintiff's failure to complete service in timely fashion is a result of the conduct of a third person, typically the process server." ***Holmes v. Coast Transit Auth.***, 815 So. 2d 1183, 1186 (Miss. 2002) (quoting 4B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1137, at 342 (3d ed. 2000)). A plaintiff also may show "good cause" if "the defendant has evaded service of process or engaged in misleading conduct, the plaintiff has acted diligently in trying to effect service or there are understandable mitigating circumstances . . . ." ***Holmes***, 815 So. 2d at 1186 (quoting 4B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1137, at 342 (3d ed. 2000)). What amounts to

'good cause' under any particular set of circumstances is necessarily fact-sensitive." *Lindsey v. United States R.R. Bd.*, 101 F.3d 444, 446 (5th Cir. 1996).

¶21.    In this case, Collins adduced evidence showing: (1) that through the course of Keith's research, the address on Newsum Drive in Germantown, Tennessee, appeared as a current address for Dr. Toikus Westbrook; (2) that through the course of Keith's research, the telephone number associated with the Newsum Drive home in Germantown was listed as a residential telephone number associated with Dr. Toikus Westbrook; (3) that Keith called the telephone number associated with the Newsum Drive home and left a message on the answering machine for Dr. Toikus Westbrook; (4) that someone who had received that message at that telephone number had returned Keith's call; (5) that Keith told the person on the telephone that he had a delivery for Dr. Toikus Westbrook from "Maxim Physicians," Dr. Toikus Westbrook's employer; (6) that the person on the telephone identified himself as Dr. Toikus Westbrook; (7) that after process server Murphree arrived at Incredible Pizza, he paged "Dr. Toikus Westbrook;" (8) that a lady escorted him to a back room where he served process on a man who identified himself as Dr. Toikus Westbrook; and (9) that Murphree executed an Affidavit of Service in which he stated that he had served the summons and the complaint on Toikus Westbrook on April 13, 2013.

¶22.    We find that the trial court abused its discretion by finding that Collins failed to show good cause. The record reflects that Collins made a sufficient showing of good cause for having failed to serve Dr. Toikus Westbrook within 120 days of filing her complaint. Collins presented compelling evidence that there were "understandable mitigating circumstances"

13

excusing Collins's failure to serve Dr. Toikus Westbrook within 120 days. It is undisputed that Collins's counsel filed suit within the time allowed by the applicable statute of limitations and assigned to a trusted employee the task of effecting service of process. Due to "very extreme personal problems," this person failed to complete the assignment. Upon discovering this deficiency, the attorney immediately took appropriate steps to effect service within what remained of the 120-day period.

¶23. The record shows overwhelmingly that Collins's failure to make timely service of process on Dr. Toikus Westbrook was caused entirely by "the conduct of a third person," namely, Dr. Jesse Westbrook. *Holmes*, 815 So. 2d at 1186 (quoting 4B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1137, at 342 (3d ed. 2000)). The trial court's finding that Dr. Jesse Westbrook did not misrepresent his identity was not supported by substantial evidence and was an abuse of discretion. The actions of Dr. Jesse Westbrook and/or Dr. Toikus Westbrook were, at least, misleading. By returning Keith's call and by agreeing to receive a delivery from Dr. Toikus Westbrook's employer, Dr. Jesse Westbrook interfered with and actually obstructed Collins's attempts to serve process on Dr. Toikus Westbrook. But for Dr. Jesse Westbrook's subterfuge, Collins may have been able to serve the real Dr. Toikus Westbrook within the 120-day period, or she would have been able to file a timely and possibly successful request in the trial court for an extension of time in which to serve Dr. Toikus Westbrook. The professional process server hired by the plaintiff's attorney, and, ultimately, at the expense of the plaintiff, was misled by what can be viewed only as the deliberate deception of a third party who turned out to be a close relative of the

14

defendant. This third party's corrupt conduct caused a false return to be made on process issued by and returned to a Mississippi trial court. No litigant should be rewarded for such treachery.

¶24. The record does not suggest that Collins had reason to suspect that process had been served on any person other than Dr. Toikus Westbrook. After having the summons and complaint served on the person she had been led to believe was Dr. Toikus Westbrook, the plaintiff reasonably would not have continued to try to serve him. After all, Murphree had executed an Affidavit of Service, in which he said that he had served the summons and the complaint on Dr. Toikus Westbrook on April 13, 2012. The Affidavit of Service creates a presumption that service was properly executed and it is probative of the plaintiff's good-faith belief that the defendant had been served, notwithstanding the trial court's finding that Dr. Toikus Westbrook, in fact, had not been served process.

¶25. Similarly, in *Foss v. Williams*, 993 So. 2d 378, 379 (Miss. 2008), the defendant was served one day after the 120-day period had expired. The plaintiff's counsel argued that, although he had associated local counsel who had been responsible for effecting service, local counsel had neglected to serve the defendants, and counsel did not discover the omission until 118 days after the complaint had been filed. *Id.* As in this case, when counsel discovered the omission, counsel immediately sought to have the defendants served. *Id.* Local counsel later withdrew from the case. *Id.* This Court held that "good cause" had been proved because the failure of service was caused by the inaction of another attorney who later

had withdrawn from the case, and because counsel had taken immediate action to effect service upon discovering the problem. *Id.* at 379-80.

¶26. The cases cited by the dissent provide poor support for its conclusion that Collins failed to show good cause. Contrary to the dissent's position that this Court should confine its review in this case to the first 118 days, this Court examines what occurred during the entire 120-day period to assess whether good cause was shown. Unlike the facts in this case, in *Heard* and *Holtzman*, no attempt at service was made within 120 days. *Heard v. Remy*, 937 So. 2d 939, 944 (Miss. 2006); *In re Holtzman*, 823 So. 2d 1180, 1181 (Miss. 2002). In this case, Collins attempted service within 120 days, but service was thwarted by the deceptive acts of a third person. Unlike in *Heard* and *Holtzman*, Collins had no reason to suspect that timely service had not been achieved. And *Copiah County School District v. Buckner*, 61 So. 3d 162, 164 (Miss. 2011), involved misconduct by a process server, not deceptive acts by the defendant's relative in an effort to obstruct service of process.

¶27. We hold that Collins made a sufficient showing of good cause for her failure to accomplish service of process on Dr. Toikus Westbrook within 120 days and that the trial court abused its discretion by finding otherwise.

¶28. Alternatively, Collins argues that, if Dr. Toikus Westbrook rebutted the presumption that service was effected, and if she also had not established "good cause" in so doing, she was entitled to an extension of time under Rule 6(b)(2) of the Mississippi Rules of Civil Procedure, which provides:

> When by these rules or by notice given thereunder or by order of court an act
> is required or allowed to be done at or within a specified time, the court for

16

cause shown may . . . upon motion made after the expiration of the specified period permit the act to be done where failure to act was the result of excusable neglect.

M.R.C.P. 6(b)(2).

¶29. Collins advanced her request for an extension of time in multiple filings in the trial court and during the hearing on Dr. Toikus Westbrook's motion to dismiss. In her "Response to Motion to Dismiss," which was filed June 15, 2012, Collins argued that "[i]n the alternative, Plaintiffs request additional time to properly effectuate service on the Defendant [Toikus Westbrook]." Additionally, during the October 30, 2012, hearing regarding Dr. Toikus Westbrook's Motion to Dismiss, Collins moved *ore tenus* for an extension of time:

> [W]e took extraordinary, extreme steps to make sure process was served within the 120 day period, and we had every good faith belief that process had been served on Dr. Toikus Westbrook, because of all the testimony that the Court has – has just heard.
>
> And we only first became aware that they've alleged Dr. Toikus Westbrook had not been served, and when they filed their motion to dismiss in May. And we timely and immediately responded to that with, number one, we think we served him, but if that's not him, that's when we asked the Court . . . . That's when we asked the Court under Rule 4(c) [sic], in the alternative, for additional time to serve Dr. Toikus Westbrook, if, in fact, he didn't receive service.

In a brief she filed on November 12, 2012, after the hearing, Collins argued: "Alternatively, the UNDISPUTED Facts Require the Court to Allow Plaintiffs Additional Time to Serve the [Toikus Westbrook]." Finally, in a brief filed December 7, 2012, Collins maintained:

> Plaintiffs have overwhelmingly shown that good cause exists to extend the 120-day time period within which to effect service of process. As such, a dismissal with prejudice is not justified. Plaintiffs therefore respectfully request this Court to deny Defendant's Motion to Dismiss and grant to Plaintiffs an extension of time to serve the Defendant, Dr. Toikus Westbrook.

17

¶30.     The trial court denied Collins's motion for an enlargement of time upon a finding that Collins had failed to show excusable neglect. This Court has held that the standards for deciding whether a plaintiff has demonstrated "good cause" under Rule 4(h) and "excusable neglect" under Rule 6(b)(2) are virtually identical. *Watters*, 675 So. 2d at 1244 ("To establish 'good cause' the plaintiff must demonstrate at least as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice.") (internal citations omitted). Because Collins has established good cause for her failure to serve Dr. Toikus Westbrook within 120 days of filing her complaint, she also has proved excusable neglect, entitling her to an extension of time. Collins showed that a professional process server determined that the Newsum Drive home in Germantown, Tennessee, was Dr. Toikus Westbrook's recent residence. Keith called the residential telephone number associated with this address and left a message for "Dr. Toikus Westbrook." Someone returned his call from that number. Keith informed the caller that he had a delivery for Dr. Toikus Westbrook from Maxim Physicians, Dr. Toikus Westbrook's employer. Finally, Keith sent Murphree to Incredible Pizza to serve Dr. Toikus Westbrook process for this suit. Murphree then executed an Affidavit of Service. These facts establish excusable neglect justifying the failure to serve Dr. Toikus Westbrook and entitling Collins to an extension of time to in which perfect service.

## CONCLUSION

¶31.     In sum, we find that Perriece Collins offered sufficient proof of good cause explaining her failure to serve Dr. Toikus Westbrook within 120 days, as required by Rule 4(h) of the

18

Mississippi Rules of Civil Procedure. Moreover, Collins established excusable neglect, as articulated in Rule 6(b) of the Mississippi Rules of Civil Procedure, entitling her to an extension of time to serve process on Dr. Toikus Westbrook. Therefore, we reverse the judgments of the Court of Appeals and the Circuit Court of Leake County. We remand this case to the Circuit Court of Leake County for further proceedings.

¶32. **REVERSED AND REMANDED.**

**WALLER, C.J., RANDOLPH, P.J., AND KING, J., CONCUR. DICKINSON, P.J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY LAMAR, J. MAXWELL, J., NOT PARTICIPATING.**

**COLEMAN, JUSTICE, DISSENTING:**

¶33. Today's majority opinion drives Mississippi's appellate standard-of-review jurisprudence as far off the tracks as one might ever wish to see. Not only does the majority find the trial court erred on an issue we review only for abuse of discretion – the presence of absence of good cause for failure to serve process – but the majority, even more egregiously, holds the trial court erred in its witness-credibility determinations, which should be subject to reversal only upon a showing of manifest error. Never before today have we held that good cause for delay in serving process exists when the plaintiff's attorney entrusted the job of service of process to an employee who failed to take steps to serve process and in the absence of adequate attorney oversight. In fact, today's case arguably overrules several cases, discussed below, in which we have held the opposite. After today, an attorney who hands off the job of service of process to an employee and fails to diligently monitor the progress of service can claim good cause despite the failure. Further, the majority tacitly

19

finds error in the trial judge's determination that a witness who testified in his presence lacked credibility. Accordingly, I respectfully dissent.

¶34. "A trial court's finding of fact on the existence of good cause for the delay in service of process has been deemed a discretionary ruling . . . and entitled to deferential review on appeal." *Holmes v. Coast Transit Auth.*, 815 So. 2d 1183, 1185 (¶ 6) (Miss. 2002) (quoting *Rains v. Gardner*, 731 So. 2d 1192, 1197-98 (Miss. 1999)). In reviewing that fact-based finding, the Court examines only "whether the trial court abused its discretion and whether there was substantial evidence in supporting the determination." *Rains*, 731 So. 2d at 1197.

¶35. The trial court determined in its Final Judgment, and the record confirms, that Collins wholly failed to take any action to serve process until Day 118 of the 120-day period. Collins filed her complaint on December 16, 2011. Therefore, the 120-day period for service of process ended on April 14, 2012. On April 12, 2012, plaintiff's counsel first contacted a process server regarding serving Dr. Toikus Westbrook. According to the affidavit of the process server, service was first thereafter attempted at Dr. Toikus Westbrook's known addresses of record in Carthage and Picayune, but the attempts failed. Again according to the process server's affidavit, he then ran a skip trace which revealed several possible addresses for Dr. Toikus Westbrook, which ranged geographically from Memphis, Tennessee, to New Orleans, Louisiana.

¶36. In the case *sub judice*, Collins's attorney made no attempt to serve process until 118 of the 120 days had passed, and Collins did not file a motion to extend the 120-day period until after it had expired. The question, then, we should consider is whether the trial judge

erred in finding good cause did not exist for the 118-day delay. I do not think he did. While not dispositive, I first note the failure of the plaintiff to file a motion for an extension of the 120-day period prior to its expiration. "While there is no actual requirement that a motion for additional time be filed, 'a plaintiff who – prior to expiration of the service period – files a motion representing that he or she has been unable to serve process, will more likely succeed in demonstrating diligence than a plaintiff who does nothing.'" ***Copiah Cty. Sch. Dist. v. Buckner***, 61 So. 3d 162, 168 (¶ 21) (Miss. 2011) (quoting ***Montgomery v. SmithKline Beecham Corp.***, 910 So. 2d 541, 546 (¶ 15) (Miss. 2005)). As noted by the trial judge, when contacted to serve process two days before the expiration of the 120-day period, the process server informed Collins's counsel that, in light of the multiple possible addresses for Dr. Toikus Westbrook, "I think the chances of locating and serving him today are very slim." Despite the warning and having only two days to act, Collins did not file a motion for an extension of the 120-day deadline.

¶37. Furthermore, as found by the trial court and as the majority writes, Collins's attorney entrusted the job of serving process to a legal assistant. Nothing in the record indicates that counsel monitored the progress of the employee in accomplishing the task until April 12, 2012, or Day 118. The failure of counsel to monitor his legal assistant's progress in completing the assigned task of service of process is at most "simple inadvertence or mistake of counsel," which does not rise to the level of good cause or excusable neglect. ***LeBlanc v. Allstate Ins. Co.***, 809 So. 2d 674, 677 (¶ 12) (Miss. 2002) (emphasis added) (quoting ***Watters v. Stripling***, 675 So. 2d 1242, 1243 (Miss.1996)).

¶38.    In *Heard v. Remy*, 937 So. 2d 939 (Miss. 2006), the plaintiff, Tiffany Heard, filed a complaint against the defendant, Keith Remy, for personal injuries allegedly resulting from a motor vehicle collision. *Id.* at 940 (¶ 2). Heard filed her complaint and process issued five days before the statute of limitations expired. However, Heard failed to serve process before the expiration of the mandated 120-day time period. *Id.* After the expiration of the 120-day period, Heard filed a motion for an extension of time to serve process, and the trial court granted the motion without making a ruling as to whether good cause existed for her failure to serve within the original 120 days. Heard successfully served process during the time allowed in the trial court's granted extension. *Id.* at 940 (¶ 3). Remy then filed a motion for judgment on the pleadings, contending that the statute of limitations ran in the interim between the expiration of the original 120 days and the trial court granting the extension of time to serve process. *Id.* at 941 (¶¶4, 15). In ruling on the motion and dismissing Heard's complaint as time-barred, the trial court further found that Heard had not shown good cause for failing to effect timely service of process during the original 120-day period. *Id.* at 941 (¶ 5). On appeal, we affirmed, holding that the trial court did not abuse its discretion because the evidence showed that the failure to serve stemmed from a miscommunication between Heard's counsel and counsel's own employee. *Id.* at 943-44 (¶ 19-21).

¶39.    Like Collins in the case *sub judice*, Heard contended that the trial judge erred in finding an absence of good cause for failing to serve process during the 120-day time period. *Heard*, 937 So. 2d at 943 (¶ 19). Also like Collins, Heard's counsel relied on an employee to see to it that process was served. *Id.* at 943 (¶ 20). However, unlike today's case, in

*Heard* the plaintiff never attempted service within the 120-day period, *Id.* at 944 (¶ 20), where here, Collins finally attempted service of process after 118 days had elapsed. I do not view the two-day difference as much of a distinction. The question the trial judge answered, and that we should review, is whether Collins has demonstrated good cause for failure to serve process within the 120-day period when counsel did nothing for the first 118 days and counsel's neglect demonstrates a lack of diligence and led to the failure to timely serve. The failure that leads to the quest for good cause is not the failure to attempt service within 120 days, but the failure to achieve service. One might ask whether the majority would find good cause if a plaintiff failed to attempt service until the 23rd hour of the 120th day, or the 12th hour of the 120th day, or the beginning of the 120th day, and so forth. Whether the delay equals 118 of the 120 days or all of the 120 days, under *Heard* the answer is the same. In holding that the trial court did not abuse its discretion in finding no good cause existed, the *Heard* Court wrote, "The failure to attempt process on Remy may have been the result of a lack of communication and follow-up within the offices of Heard's counsel. The continuing failure to attempt service for four months, without adequate explanation, shows a lack of diligence beyond excusable neglect." *Id.* at 944 (¶ 20). In the case *sub judice*, Collins fails to explain why her counsel did not communicate and follow up with the legal assistant assigned to effect service of process. That said legal assistant may have been suffering through some sort of personal issues does not explain counsel's inadvertence and failure to monitor. In the instant case, Collins demonstrated a marked lack of diligence by doing

nothing for 118 days *and* by failing to file a motion for an extension of the 120-day deadline upon learning at the time that process had not in fact been served.

¶40.    In *In re Holtzman*, 823 So. 2d 1180 (Miss. 2002), plaintiff attempted to show good cause by contending that the summons and complaint had been misfiled by a new file clerk. *Id.* at 1182 (¶ 4).  The *Holtzman* Court characterized the events as "clear an example as one could wish of 'simple inadvertence or mistake of counsel.'"  *Id.* at 1183 (¶ 9).  In language that negates the majority's attempt to excuse Collins's 118-day failure by writing that Collins had no reason to believe process has not been served, (Maj. Op. at ¶ 26), the *Holtzman* Court continued, "[O]rdinary attention to his caseload would have led Ward to notice that he had received no answer from Grand Casino and to check his case file."  *Holtzman,* 823 So. 2d at 1183.  While, again, Collins asserts that the legal assistant tasked with serving process was suffering through personal problems that affected her performance, the lack of service of process was something that would have been discovered sooner with what the *Holtzman* Court described as "ordinary attention."

¶41.    In *Copiah County School District v. Buckner*, 61 So. 3d 162 (Miss. 2011), the Court found an abuse of discretion, reversed the trial judge's failure to dismiss a case for failure to timely serve process, and rendered judgment in favor of the defendants.  Charles Buckner filed a personal injury complaint against the Copiah County School District and Kenneth Funches, a bus driver, after he allegedly received injuries from a collision with a school bus driven by Funches.  *Buckner*, 61 So. 3d at 164 (¶ 3).  Buckner had summonses issued for the defendant, but failed to serve them.  *Id.*  More than a year after the filing of the complaint,

the court ordered a status conference with Buckner's counsel. *Id.* at 164 (¶ 4). Prior to the hearing, Buckner's counsel filed an application for a clerk's entry of default with an accompanying affidavit averring that process had been served. *Id.* Apparently, the process server reported to Buckner's counsel that process had been served when it in fact had not. *Id.* at 164 (¶ 5). When Buckner's counsel learned the truth, he withdrew his application for entry of default. On February 3, 2009, the trial judge orally granted additional time to serve process. *Id.* at 164-165 (¶¶ 5, 7). Buckner served the school district and Funches on June 4 and June 5, 2009, respectively. *Id.* at 165 (¶ 7). The extension of time granted by the trial court ended on June 2, 2009. *Id.* at 165 (¶ 10). Buckner's counsel claimed that he did not receive a copy of the order granting time until June 4, 2009, despite attempts by his legal assistant to obtain it. *Id.* at 165 (¶ 9). The legal assistant testified at the hearing on the defendants' motions for summary judgment that someone at the clerk's office had told her the order had been signed and promised to fax it to her, but that she never received a faxed copy until June 4. She told Buckner's attorney that she had been told the order had been signed, but the attorney did not ask when. *Id.* at 165 (¶ 10). The trial judge found that good cause existed for Buckner's failure to timely serve process and denied the dispositive motions. *Id.* at 165 (¶ 11).

¶42. On appeal, the ***Buckner*** Court held that the trial court had abused its discretion and reversed and rendered the case. *Id.* at 171 (¶ 31). In holding that no good cause existed, the Court wrote as follows:

> Buckner's counsel asserted that he had relied upon the process server's assertion that the defendants had been served. Counsel's belief that service

25

had been achieved was evidenced by his filing of an affidavit to that effect with an application for entry of default when the defendants had failed to answer. However, a more attentive review of the file would have informed counsel that, because there was no return of service for the defendants, the reason they had failed to answer was that they had not been served with process. Evidently, Buckner's counsel did not check for a return of service until after the statute of limitations had expired, after the trial court had set a date for a status hearing, after he had filed an application for entry of default, and after opposing counsel, upon discovering the lawsuit, had notified him that their clients never had been served. In *Heard*, the Court found that counsel's lack of communication and follow-up concerning service constituted mistake or inadvertence. *Heard*, 937 So. 2d at 944. The conduct at issue here likewise manifested a lack of diligence and amounts to mistake or inadvertence. We find that the trial court abused its discretion in refusing to set aside the extension of time, because Buckner did not present substantial evidence to support a finding of good cause for the failure to serve the defendants within the 120 - day period.

*Buckner*, 61 So. 3d at 168 (¶ 20). Accordingly, the unanimous *Buckner* Court *reversed* the discretionary ruling of the trial court finding good cause for failure to serve process because, despite representations from the process server that process had been served, counsel did not check for a return of service of process. If the described failure to monitor in *Buckner* mandated a reversal of the trial judge's discretionary finding of good cause, then the failure to monitor in today's case suffices to uphold the trial court's discretionary finding of a lack of good cause. The majority would distinguish *Buckner* due to the fact that the attorney's inadvertence in *Buckner* included relying on representations from a process server rather than an employee, but the distinction works *against* the majority. If the Court held that a trial court abused its discretion in finding good cause existed when counsel had failed to follow up on representations from a nonemployee, then certainly we should – and clients should – be able to expect attorneys to keep track of their own employees' performance or

26

nonperformance, as the case may be, of their assigned tasks, and hold that a trial court did not abuse his discretion in finding an absence of good cause when an attorney fails to monitor the progress of his employee.

¶43. Here, Collins's reliance on *Foss v. Williams*, 993 So. 2d 378 (Miss 2008), to excuse the conduct of his legal assistant is misplaced for two reasons. First, *Foss* does not stand for the proposition that taking speedy action at the close of the 120-day window conclusively establishes good cause. Instead, the *Foss* Court merely affirmed that a trial court's decision "that it would not dismiss Williams' complaint with respect to Dr. Foss based on [the trial court's] finding that good cause existed for Williams' failure to serve process timely" was not an abuse of discretion. *Foss*, 993 So. 2d at 380 (¶ 9). Second, *Foss* dealt with a miscommunication between plaintiff's counsel and associated counsel as to who would be responsible for effecting service. *Id.* at 379 (¶5). In the instant case, the trusted legal assistant was directly employed by Collins' counsel, and she simply failed to carry out the duty assigned to her by her employer. For 118 days, counsel failed to follow up with his employee to ensure that service had been commenced against opposing parties. Such an oversight cannot be said to be diligent such that a plaintiff may claim "good cause why such service was not made" within the 120 days provided by Rule 4(h).

¶44. In today's holding that the plaintiff demonstrates good cause for failure to serve process because the employee of plaintiff's counsel "failed to complete the assignment" of serving process, (Maj. Op. at ¶ 22), the majority issues a holding contrary to our standard of review *and* contrary to all of the above-described cases that hold that similar failures by

27

process servers and attorneys' employees *do not* establish good cause for failure to serve process. What we heretofore have deemed simple inadvertence and mistake of counsel not rising to the level of good cause has now become good cause. Attorneys who fail to pay "ordinary attention" to their caseloads may not lay claim to good cause and be freed from the consequences of not paying attention. Defendants in aging cases, with the memories of witnesses fading and evidence aging, will be subject to service of process for a longer period of time, even though the cause for the delay before today did not amount to good cause.

¶45. The majority in large part bases its position that good cause for failure to serve the correct Dr. Westbrook rests in the conduct of Dr. Jesse Westbrook when the process server spoke with him in an attempt to locate Dr. Toikus Westbrook. The process server testified that Dr. Jesse Westbrook identified himself as Dr. Toikus Westbrook. The trial judge heard the same testimony and observed the process server as he testified. In his final judgment, the trial judge wrote as follows concerning whether Dr. Jesse Westbrook misrepresented his identity:

> This Court finds that once process server, Davy Keith, had located an address for Dr. Toikus Westbrook in Germantown, Tennessee, he contacted Gary Murphree, a process server in Germantown, Tennessee, to serve process on Dr. Toikus Westbrook. Mr. Keith called Dr. Jesse Westbrook and left a message. Thereafter, Dr. Jesse Westbrook returned Mr. Keith's call and told Mr. Keith that Dr. Toikus Westbrook was "not available." Mr. Keith explained that he had a delivery for Dr. Toikus Westbrook from Dr. Toikus Westbrook's employer, Maxim Physicians. Although the dialogue between Mr. Murphree and Dr. Jesse Westbrook at the pizza parlor where they met is disputed, Plaintiffs assert that Dr. Jesse Westbrook told him he was Dr. Toikus Westbrook. However, on cross-examination, Mr. Murphree acknowledged that their strategy was a subterfuge designed to deceive Dr. Jesse Westbrook to induce him to appear at the pizza parlor to receive the summons. In

28

addition, Dr. Jesse Westbrook testified by affidavit that Mr. Murphree asked him if he was "Dr. Westbrook," who, of course, he is.

The trial judge as finder of fact on the issue made credibility determinations and did not credit the testimony that Dr. Jesse Westbrook had misidentified himself as Dr. Toikus Westbrook. We leave "the finding of fact on the existence of good cause or excusable neglect for delay in serving process under Rule 4(h)." *Stutts v. Miller*, 37 So. 3d 1, 3 (¶ 7) (Miss. 2010). What the majority described as a record that "shows overwhelmingly that Collins's failure to make timely service of process on Dr. Toikus Westbrook was caused entirely by 'the conduct of a third person" (Maj. Op. at ¶ 23), is rather testimony from one witness that the trial judge heard, observed, and rejected on grounds of credibility. We reverse the trial judge as finder of fact in the determination of good cause only when the trial judge's "discretion is abused or is not supported by substantial evidence," and neither is the case today.

¶46.    More to the point – the majority is reversing the trial judge on an issue of witness credibility. In order to find the trial judge erred in finding no good cause or excusable neglect, the majority finds – as a matter of fact – that Dr. Jesse Westbrook acted to trick the process server into thinking that he, Jesse, was Toikus. The majority refers to Dr. Jesse Westbrook's "subterfuge," and writes that he engaged in "deliberate deception," and even goes so far as to find Dr. Jesse Westbrook guilty of "corrupt conduct" and "treachery." (Maj. Op. at 23). As shown in the above-quoted excerpt from the trial judge's ruling, the trial judge considered the argument and rejected it because he did not find the process servers to be credible. I can find no reported case wherein the Mississippi Supreme Court has

29

considered the deference owed to a circuit court judge making credibility determinations in the context of the failure to serve process. Of course, as cited above, the general standard of review for findings of fact in the Rule 4(h) context is that of abuse of discretion and substantial evidence, but in every other context I could identify, we consider credibility determinations made by the finder of fact to be in error only upon a showing of manifest error, that the findings of the trial court are clearly erroneous, or that the findings are against the overwhelming weight of the evidence. In reviewing challenges to the use of peremptory strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986), we have acknowledged the role of the trial judge in making credibility determinations and "will not overrule a trial court on a *Batson* ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence." *Hicks v. State*, 973 So. 2d 211, 218 (¶ 23) (Miss. 2007) (quoting *Thorson v. State*, 721 So. 2d 590, 593 (¶ 4) (Miss. 1998)). Chancellors often act as the fact-finders in litigation pending before them, and we have clearly established that when reviewing a chancellor's credibility determinations, "Our standard of review is indeed deferential, as we recognize that a chancellor, being the only one to hear the testimony of witnesses and observe their demeanor, is in the best position to judge their credibility." *Owen v. Owen*, 928 So. 2d 156, 168 (¶ 35) (Miss. 2006) (quoting *In re Estate of Carter*, 912 So. 2d 138, 143 (¶ 18) (Miss. 2005)). We afford great deference to administrative agencies' determinations of witness credibility. *See McFadden v. Miss. State Bd. of Med. Licensure*, 735 So. 2d 145, 157 (¶ 46) (Miss. 1999). Circuit court judges sitting without juries are

afforded the same deference as chancellors. *City of Jackson v. Perry*, 746 So. 2d 373, 376 (¶ 9) (Miss. 2000).

¶47. To be clear, I do not think the trial judge in the case *sub judice* abused his discretion – if indeed abuse of discretion is the correct standard – in noting the duplicitous methods employed by the process server and therefore finding the testimony of the process server incredible. Under any standard of review higher than *de novo*, I cannot – not having observed the witness or been present for his testimony – agree that the trial judge erred in finding against the plaintiff on the factual question of whether Dr. Jesse Westbrook misled the process server. I certainly cannot so easily as does the majority make that credibility determination from the typed record. (The majority does not explicitly find the testimony in question to be credible or incredible, but the majority cannot ascribe the above-quoted terms to Dr. Jesse Westbrook's alleged actions and hold, as it does, that the trial judge erred on the issue without finding it credible and, correspondingly, that the trial judge erred in ruling otherwise.) However, I would also clarify that, in the context of reviewing whether the trial court properly found good cause or the lack thereof for the timely service of process, the trial court's determinations of witness credibility will be reversed only upon a showing that they are clearly erroneous.

¶48. For the foregoing reasons, I dissent.

**LAMAR, J., JOINS THIS OPINION.**